**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Deborah MATTHEWS, Defendant–Appellant.**

**No. 00–5816.**

United States Court of Appeals,
Sixth Circuit.

Oct. 4, 2002.

Before SUHRHEINRICH, SILER, and GILMAN, Circuit Judges.

SILER, Circuit Judge.

Defendant Deborah Matthews appeals her convictions and sentence. Matthews argues that there was insufficient evidence to support her convictions, and that the district court erred in its calculation of the amount of loss. Neither of these arguments is persuasive, and we AFFIRM.

I.

Matthews was indicted on the following charges: bank fraud in violation of 18 U.S.C. § 1344(2); knowingly making false entries in bank records in violation of 18 U.S.C. § 1005; making material false statements to federal investigators in violation of 18 U.S.C. § 1001; and two counts of embezzlement in violation of 18 U.S.C. § 656. She was convicted on the first three counts and acquitted on the two embezzlement counts. The district court sentenced Matthews to 33 months imprisonment.

Her convictions arose from her employment at the Montgomery and Traders Bank & Trust Co. in Mt. Sterling, Kentucky. According to trial testimony, Matthews discovered and extinguished a small fire in the bank's vault at 12:17 p.m. on January 16, 1996. When bank officers and firemen arrived, Matthews told them that the fire had consumed $143,000 in bundled currency that she had packaged for shipment that day to the Federal Reserve Bank. Matthews explained that she had placed the bag on or near an ashtray in the vault shortly after noon, and theorized that a burning cigarette left in the ashtray might have set the bag on fire.

The government presented extensive evidence that contradicted Matthews's account. An FBI forensic expert testified that the amount of currency Matthews claimed she bagged for shipment would have weighed approximately 15.25 pounds and included 6,500 bills. However, video footage taken from bank security cameras showed Matthews entering the vault with only a small bag in her hand, one too small to have contained the amount and denominations she claimed. Photographs of the remains of the fire showed only a small amount of ash and 320 largely undamaged one dollar bills, with rubber bands and paper bill wrappers still on them. The

FBI's expert testified that, in order to achieve the total destruction by fire of $143,000 as Matthews claimed, he had to douse the bills in gasoline and burn them in a special container for nearly two hours—far longer than the 15–minute period between Matthews's placement of the bag in the vault and her discovery of the fire.

Other evidence incriminated Matthews. FBI Special Agent Gary Ludwick, relying on various bank records, explained how Matthews used her position as a teller to falsely record hundreds of cash deposits to her account for which the bank did not in fact receive cash, and then wrote checks against these amounts. By claiming to receive money the bank did not in fact receive, Matthews created a discrepancy between the cash attributed to her teller drawer in the bank's general ledger and the cash actually present there. This discrepancy, Ludwick testified, was $143,-000—the amount Matthews claimed was destroyed in the fire. Other witnesses then explained how Matthews used her supervisory position to violate bank policy, which required regular counts of tellers' cash drawers, in order to avoid detection of her deception. Ludwick further testified that, at the time of the fire, Matthews carried credit card balances of $35,640, with a minimum monthly payment of $1,371, which exceeded her monthly salary of $1,100. The government also introduced a "prayer book" found at Matthews's teller station after the fire, which contained incriminating entries in her handwriting, such as "Please God, forgive me my sins and please, Dear Lord, don't let me get caught. Help me to pay back all of the money that I owe the bank." Finally, bank Vice–President Pat Rogers testified that a change in bank policy, which required that she personally conduct all counts of teller drawers, made discovery of Matthews's deception imminent.

On the basis of the above evidence, the prosecution argued at trial that Matthews, with reason to believe her embezzlement would be detected, prepared a small bag of one dollar bills, which she placed in the vault and ignited. When the fire was detected, the prosecution argued, Matthews falsely told bank officials, insurance investigators and the FBI that the fire had destroyed $143,000 in currency, a ruse that would explain the discrepancy between the money attributed to her in the general ledger and the amount present in her teller drawer.

## II.

The standard of review for a claim of insufficient evidence is whether, after viewing the facts in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). A district court's determination of the amount of loss is a finding of fact which this court reviews for clear error. *See United States v. Guthrie,* 144 F.3d 1006, 1011 (6th Cir.1998).

### A. *Bank Fraud*

To support a conviction for bank fraud under 18 U.S.C. § 1344(2), the United States must show that: (1) the defendant knowingly executed or attempted to execute a scheme to defraud a financial institution; (2) the defendant acted with intent to defraud the bank; and (3) the bank was insured by the FDIC. *See United States v. Everett,* 270 F.3d 986, 989 (6th Cir.2001).

Matthews argues that the government's evidence was insufficient to prove that she knowingly executed a scheme to defraud the bank or had the intent to do so. In particular, she argues that the government

presented no evidence sufficient to contradict her claim that the deposits she credited to her account and to her mother's account represented actual physical receipts of cash. Matthews offered two explanations for the deposits. First, she told insurance investigators that the excess income came from $60,000–$70,000 her mother kept in a safe deposit box at the bank. At trial, she offered a second explanation—that the money came from her husband, who frequently dealt with large cash sums as part of his horse-trading business.

Her argument is unpersuasive. Special Agent Ludwick testified that Matthews recorded more than $144,000 in excess cash deposits (*i.e.*, beyond her salary) to her checking account and to that of her mother, Pauline Cockell, in the six years preceding the fire. Supporting his findings with various documentary exhibits, Ludwick then explained that Matthews recorded most or all of these deposits as transfers from her mother's savings account, and that this account showed a zero balance at the time the transfers were made. Ludwick further explained how Matthews wrote checks against these fake deposits. Finally, the government presented evidence that all but a few thousand of the $60–70,000 that once had been kept in her mother's safe deposit box had been spent years ago, and that bank records showed no access to the box in the six years preceding the fire, thereby establishing that the deposits could not have come from these funds.

This evidence, construed in the light most favorable to the government, was sufficient to allow a rational trier of fact to conclude that the deposits did not reflect actual receipts of cash from her mother or husband, as Matthews claimed, but rather that Matthews lied about receiving these amounts in order to obtain money from the bank that she was not entitled to. The extensive additional evidence presented by the government at trial—in particular, that Matthews lied to avoid a count of her cash receipts, and that the fire could not possibly have consumed $143,000 as she claimed—adds further weight to this conclusion.

## B. *False Entries in Bank Records*

In order to support a conviction for false entries in bank records under 18 U.S.C. § 1005, the United States must show that: (1) the bank was federally insured; (2) the defendant made a false entry in a book, record, or statement of the bank; and (3) the defendant made the entry knowing it was false and intending that it would deceive officers of the bank. *See* 18 U.S.C. § 1005; *see also United States v. McGuire*, 744 F.2d 1197, 1202 (6th Cir. 1984).

At trial, a bank auditor testified that she attempted to conduct a count of the cash in Matthews's drawer approximately two months before the fire, but that when she arrived that day Matthews claimed she had already bagged $126,000 of the cash in her drawer for shipment to the Federal Reserve Bank, and could not easily re-open it for inspection. In connection with this attempted audit, the government introduced vault sheet entries signed by Matthews, in which she attested to preparing cash shipments of $64,000 and $62,000 ($126,000 total) for transportation to the Federal Reserve that day. The government then introduced other bank and armored car shipping records for that day showing that no such shipment was made. Finally, the government presented testimony that the $126,000 Matthews claimed to have bagged for shipment equaled the amount of cash short from her drawer on that date as a result of crediting false deposits, and that she had lied at other times to avoid an accounting of the cash in her possession.

Matthews argues that the government's evidence of intent to deceive was insufficient because she notified the auditor immediately after the attempted audit that she had decided not to make the shipment. Because the bank did not spend any appreciable amount of time believing that a shipment had been made, Matthews contends, it cannot be argued that she acted to deceive the bank.

■ We reject this argument. The essence of the government's claim is that Matthews lied about having placed $126,000 in a bag for shipment that day in order to prevent the auditor from discovering that her cash drawer was $126,000 short. For purposes of this deception, it was irrelevant whether she later followed through on the shipment or cancelled it, so long as the auditor believed at the time of her audit that Matthews had the $126,000 in her possession. By the time Matthews allegedly told the auditor that she had decided not to ship the cash, her deception was already complete: she had avoided discovery that her teller drawer was short—at least until the next audit. The internal bank records and armored car records showing that no shipment was in fact made are important only because they highlight the fact that Matthews did not have the cash to ship. Thus, any evidence that Matthews later advised the auditor that she had cancelled the shipment does not in any way counter the government's evidence that Matthews acted to deceive the auditor. Even if such evidence were relevant, the auditor contradicted Matthews on this point and testified that she did not find out that the shipment was never made until after the January fire.

The government presented evidence more than sufficient for a rational trier of fact to conclude, beyond a reasonable doubt, that Matthews made false statements on her vault cash sheet for that day with the intention of deceiving the bank's auditor about the amount of cash in her possession at that time.

### C. *False Statements to the FBI*

To support a conviction under 18 U.S.C. § 1001, the government must show that: (1) the defendant made a false statement; (2) she knew it to be false; (3) the statement was relevant to the functioning of a federal department or agency; and (4) it was material. *See United States v. Gatewood,* 173 F.3d 983, 986 (6th Cir.1999). A statement is material under § 1001 "if it has the natural tendency to influence or is capable of influencing the federal agency." *See United States v. Lutz,* 154 F.3d 581, 588 (6th Cir.1998) (citing *United States v. Gaudin,* 515 U.S. 506, 509, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995)). The government brought this count against Matthews for lying to Ludwick about the circumstances of the January 16, 1996 fire. Specifically, Matthews told him that at noon that day she took $143,000 in cash from her teller drawer and placed it in a bag on the countertop in the vault, and that the great bulk of this money (all except for a few hundred ones) was consumed in a fire that broke out fifteen minutes later. Ludwick testified that Matthews's account of the fire significantly influenced the course of his investigation, leading him to conduct burn tests on $143,000 in cancelled currency and an in-depth analysis of Matthews's banking records.

On appeal, Matthews argues that the government failed to present evidence sufficient to allow a rational trier of fact to conclude beyond a reasonable doubt that her account of the January 16 fire was in fact false. For the reasons already given above, this claim is unpersuasive.

### D. *Amount of Loss*

Matthews argues that the district court erred in determining the amount of loss in this case to exceed $120,000. Matthews

contends that, apart from her testimony that $143,000 was consumed in the fire, which the jury found incredible, there was no evidence presented at trial or sentencing that the bank suffered a loss exceeding $120,000. Matthews did not object to this enhancement at sentencing, and raises this issue for the first time on appeal.

This argument is meritless. The loss came not from the fire, which clearly consumed little or nothing, but from the cash deposits Matthews fraudulently credited to herself and drew upon during the six years preceeding the fire. As noted above, the details of these transactions, which exceeded $144,000, were amply supported in the record. Thus, although the district court did not explain the basis for its conclusion that the amount of loss exceeded $120,000, there was more than sufficient evidence in the record to support this finding.

AFFIRMED.